IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

JOSHUA TOWNS,

                                                      OPINION AND ORDER

                    Plaintiff,

                                                      17-cv-912-bbc

          v.

KAREN ANDERSON, DR. DALIA SULIENE,
DR. KARL HOFFMAN, DR. SYED and KIM CAMPBELL,

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Pro se plaintiff Joshua Towns, who is incarcerated at the Wisconsin Resource Center,

is proceeding on Eighth Amendment claims that defendants Karen Anderson, Kim Campbell,

Dr. Dalia Suliene, Dr. Karl Hoffman and Dr. Syed violated his constitutional rights by failing

to provide adequate medical care for his left knee pain while he was incarcerated at the

Columbia Correctional Institution between 2012 and 2015.  Before the court is defendants'

motion for summary judgment.  Dkt. #22.  For the reasons stated below, I am granting

defendants' motion for summary judgment and closing this case.

Before I set forth the undisputed facts, a few preliminary matters require attention.  First,

in his brief in response to defendants' motion for summary judgment, plaintiff asks the court

to "grant [Campbell] summary judgment because I lack the evidence to proceed."  Dkt. #34

at 6.  His request will be granted and his  Eighth Amendment claim that defendant Campbell

denied him needed medical care because he could not pay a co-payment will be dismissed.

Second, plaintiff has proposed several findings of fact about incidents or health service requests that are not related or relevant to the specific claims on which he was granted leave to proceed. For example, plaintiff proposed several findings of fact related to the denial of a low bunk restriction, the removal of his wheelchair and being out of pain medication. Dkt. #33 at ¶¶ 62-68, 75-76, 83-90. Although plaintiff included similar allegations in his complaint, dkt. #1, I did not grant him leave to proceed on an Eighth Amendment claim related to these allegations because he failed to allege that any of the named defendants knew about these matters or were personally responsible for his lack of pain medication or the denial of a low bunk restriction or wheelchair. Dkt. #10 at 3-4, 11. Moreover, in response to defendants' motion for summary judgment, plaintiff has failed to present any *evidence* that defendants knew about these alleged deprivations of medical care or were responsible for them. Accordingly, I have not considered any of plaintiff's proposed findings of fact or arguments about events that are not the subject of this lawsuit and do not relate to the claims on which plaintiff was allowed to proceed.

Finally, in accordance with this court's summary judgment procedures attached to the pretrial conference order in this case, I have not considered any of plaintiff's proposed findings of fact that do not contain citations to admissible evidence. Summ. Judg. Proc. §§ I.B and II.D.2, dkt. #15 at 5-7.

With these considerations in mind, I find the following facts proposed by the parties to be undisputed unless otherwise noted.

UNDISPUTED FACTS

A. The Parties and Background

Plaintiff Joshua Towns is now incarcerated at the Wisconsin Resource Center, but all of the events at issue in this case took place while he was incarcerated at the Columbia Correctional Institution. After transferring to Columbia in 2011, plaintiff saw various health care professionals for chronic knee pain. He is six feet tall and weighs approximately 300 pounds.

Defendants were all employed at Columbia at some point between 2011 and 2015. Karen Anderson was the health services unit manager from December 4, 2011 to January 12, 2014; Dalia Suliene worked as a physician from 2006 to April 5, 2013; Karl Hoffman worked as a physician from February 2014 to 2015; and Syed was a physician during the entire relevant period.

The physicians' responsibilities included: diagnosing and treating inmates' medical needs, illnesses and injuries; prescribing and managing medications; and arranging for consultations with outside providers. As the health services unit manager, defendant Anderson managed and supervised health care services, developed policies and procedures, monitored care plans, prepared required reports and acted as a liason to other disciplines, institution units and community health care providers. In addition, she monitored nursing practice documentation in Department of Corrections medical records. She did not evaluate, diagnose, determine a course of treatment for inmates or prescribe medications for

them, have any direct patient care contact with inmates or have any control over the schedules of physicians or outside specialists.

Absent a true medical emergency, the institution does not allow inmates to "skip ahead" in the line of waiting patients. An inmate seeking care for a non-emergency, and for specialist services in particular, must wait until a provider is available. For example, orthopedic specialist Dr. Ellen O'Brien visits Columbia once every month or every other month, seeing a full load of patients each time. If something disrupts Dr. O'Brien's scheduled appointments during her visit, such as an institution lockdown, all of her pending appointments must be rescheduled for the following month or months.

## B. 2012 Medical Treatment and Health Service Requests

As of February 2012, plaintiff's "active problem list" or list of medical issues included asthma, right hip pain, left knee "giving out" and pain and obesity. Plaintiff self-reported an allergy to ibuprofen, so it is not possible to treat him with nonsteroidal anti-inflammatory drugs (NSAIDs) like ibuprofen. Therefore, plaintiff received acetaminophen on a consistent basis from at least November 24, 2009.

On February 13, 2012, plaintiff saw Dr. Suliene because his knee was "giving out" and causing pain. At this time, plaintiff had completed six physical therapy sessions that had not improved his condition. Dr. Suliene ordered an outside orthopedic consultation with Dr. O'Brien, who evaluated plaintiff on February 17, 2012. O'Brien noted tenderness and audible and palpable crepitus (popping or cracking) that was greater in plaintiff's left knee

than in his right knee. She recommended x-rays of plaintiff's knees, continued physical therapy and custom arch supports. (Although defendants say that O'Brien also recommended that plaintiff wear personal shoes as much as possible, plaintiff says that neither physician told him this.) Dr. O'Brien did not recommend the use of any medications to treat plaintiff. X-rays taken on February 21, 2012 showed "narrowing of the joint space due to mild degenerative changes," reflecting "mild osteoarthritis" in both of plaintiff's knees.

Plaintiff did not submit any health service request forms in 2012 until May 6, 2012, when he wrote that "I am having very sharp pains in my stomach because [of] all the aspirin I have been given and I am still having knee and back pains." Plaintiff had never been prescribed aspirin but it is available for purchase in the canteen. Plaintiff was actually referring to acetaminophen in his health services request form. On May 7, plaintiff was told by a staff member that he had an appointment scheduled with a physician.

On May 15, 2012, Dr. Suliene saw plaintiff for complaints of asthma and left knee pain, but plaintiff did not bring up stomach pain at that visit. Dr. Suliene prescribed sulfasalazine, an anti-inflammatory, for his knee pain and renewed his prescription for acetaminophen. According to Dr. Suliene, for chronic knee pain and weakness like plaintiff's, physical therapy and weight loss are the most effective treatments. On May 18, 2012, Dr. Suliene discontinued the sulfasalazine and prescribed salsalate (Disalcid), another anti-inflammatory drug, which is similar to ibuprofen.

Plaintiff submitted a health service request form on June 18, 2012, complaining about

knee pain and other conditions. On June 26, 2012, plaintiff saw a nurse for back pain and darkened urine and reported that his medications were ineffective for both his back and knee pain. The nurse recommended that he alternate heat and ice applications and increase his fluid intake. On June 29, 2012, Dr. Suliene saw plaintiff for back spasms and bilateral foot and knee pain. She noted that plaintiff's body mass index was 43 and that much of his pain was the result of the stress on his body caused by obesity. Dr. Suliene prescribed cyclobenzaprine, a muscle relaxant, for his back spasms, and recommended that he work on losing weight. (Plaintiff says that Dr. Suliene gave him only ice and acetaminophen but he has not presented any evidence to support this contention.)

Throughout July and August 2012, plaintiff saw a physical therapist who noted that plaintiff was showing slow but steady progress in strengthening his knee and reducing his pain. On July 16, 2012, plaintiff submitted a health service request form in which he reported that after physical therapy the day before, he was having a lot of swelling in his left knee. He also complained of continued lower back pain. On July 17, health services staff told plaintiff that he was scheduled to see a physician. (Plaintiff says that he submitted another health service request at some point between May 6 and July 16, 2012 but he does not identify the date or content of the request. Defendants say that no additional request appears in plaintiff's chart during this period.)

On July 27, 2012, plaintiff saw Dr. O'Brien, who recommended physical therapy, x-rays of the lumbar spine, lumbar stretches and lifting no more than 50 pounds unassisted for 60 days. She did not recommend any medication or other course of treatment. The

same day, Dr. Suliene issued a restriction for plaintiff regarding the use of his lower limbs.

Although plaintiff did not submit any health service request forms between July 16 and August 1, 2012, he submitted a form on August 1 stating that he had written numerous requests to see a doctor. Staff responded that he was scheduled for x-rays and had another doctor's appointment soon. Dr. Adler treated plaintiff on August 6, 2012 with a steroid injection for his knee.

Plaintiff wrote to Anderson, the health services unit manager on August 18, 2012, stating that he had seen the doctor numerous times for his knee and back over the past 18 months and now wanted to see a specialist. (Although plaintiff says that he wrote the request on August 20, he does not dispute that the request was marked "received" on that day instead.) Anderson responded that "you were seen by Dr. Adler on 8/6/12 and a plan of care is in place – Dr. O'Brien will see you soon – she is a specialist in Orthopedics."

On September 25, 2012, plaintiff submitted a health services request form, in which he stated that "I still have not seen the MD or specialist about my pain nor did I [receive] a response from the HSU Manager Mrs. Anderson." Dr. Suliene responded that plaintiff was scheduled for a follow-up appointment with Dr. O'Brien and instructed him to continue physical therapy and weight loss. Plaintiff saw Dr. O'Brien on October 19, 2012. He also saw other healthcare providers on December 6, 2012 and January 17, 2012.

### C.  2013 Health Service Requests and Treatment

Plaintiff received physical therapy for his knee on January 31, 2013 and February 7,

18 and 27, 2013. He submitted health service requests on March 22 and April 1 and 18, 2013 about having knee pain and needing to see a doctor. (Plaintiff has not presented any evidence that Anderson or any of the other defendants saw these requests or were personally involved in responding (or failing to respond) to them.) On March 22 and April 18, 2013, the health services unit wrote plaintiff to tell him he was scheduled to see a physician. Plaintiff saw a medical provider at Columbia on March 26 and 28, 2013. (It appears from the medical records that the provider was a physician, but the parties do not make this clear.) In addition, on April 19, 2013, plaintiff saw Dr. Grossman at Waupun Memorial Hospital and had a magnetic imaging study of his left knee. The imaging study showed "mild degenerative spurring involving the patella on the left knee" and "prominent enthesopathy involving the tibial tuberosity on the left." Plaintiff saw a different medical provider at Columbia on May 7, 2013. On May 15, 2013, Dr. Grossman diagnosed degenerative joint disease with patellae tendinosis: chronic tendinopathy.

Plaintiff submitted a health service request on May 28, 2013, asking to see a doctor about his knee pain. On June 10, 2013, plaintiff sent a letter addressed to Anderson, requesting "effective pain medication" and asking to see Dr. O'Brien. On June 12, 2013, Anderson responded, advising plaintiff that he had an upcoming appointment with a physician. Five days later, on June 17, plaintiff saw a physical therapist. On June 19, 2013, plaintiff wrote to the health services unit to ask when he would be seeing the doctor and a staff member responded that he was scheduled to see one. On June 26, 2013, a physician prescribed plaintiff amitriptyline for knee pain.

On July 17, 2013, plaintiff sent a letter asking Anderson to instruct his treating physician to evaluate the best course of treatment, permit him to purchase a new pair of shoes, request that the physician reevaluate his pain management and "escalate prescribed pain relief to the next level." Health services unit staff responded on July 18 that all health requests were routed through the nurses, that Anderson did receive copies and that he was scheduled to see the physician to address his concerns. Plaintiff submitted additional health service requests on July 18 and August 8, 2013. Health services unit staff told plaintiff on August 8, 2013 that he was scheduled to see a physician within one to two months, as the schedule allowed.

On August 10, 2013, plaintiff wrote to Anderson, stating that waiting one to two months to see a doctor was not proper treatment and was not consistent with the recommendations given by the physician at Waupun Memorial. On August 13, 2013, health services unit staff responded on Anderson's behalf, stating that plaintiff had an appointment with the physician that month and that plaintiff could be seen on sick call if necessary. However, staff explained that the physician would be able to offer the best options for treatment.

On August 25, 2013, plaintiff sent a letter requesting that Anderson contact Dr. O'Brien to set up an appointment for surgical intervention on his knee. (There is no correspondence between plaintiff and the health services unit dated August 23, 2018, as plaintiff alleges in his complaint.) Anderson responded personally, stating that plaintiff was scheduled to be seen by a physician within the week.

9

On August 29, 2013, plaintiff submitted a health services request stating that he had sent 20 requests to see a doctor. Again, he was told that an appointment had been made. Plaintiff saw a prison physician on September 11, 2013 and reported that the amitriptyline was not effective for his knee pain. The physician prescribed a trial of topical lidocaine and told plaintiff to continue with salsalate and acetaminophen. Plaintiff also saw Dr. O'Brien in September 2013. Plaintiff submitted additional health service requests on October 15, November 12, December 2 and December 19, 2013 about needing to see a physician for his knee pain and was told by staff that he was scheduled to see a doctor.

D.    2014 Health Service Requests and Treatment by Dr. Hoffman

Plaintiff submitted four health service requests on January 5, 2014, stating that Dr. Margaret Anderson had instructed prison medical staff to manage his pain. The health services unit responded that a physician had ordered physical therapy twice a week and a follow-up visit with an orthopedist. He also submitted an additional request for treatment on January 28, 2014.

As of February 2014, plaintiff's active problem list included asthma, right hip pain, left knee pain and "giving out," morbid obesity, headaches and migraines and chondromalacia patellae in his left knee. Dr. Hoffmann was aware that plaintiff's complaints of pain had been treated previously with non-opioid medications such as acetaminophen, prednisone, cyclobenzaprine and amitriptyline and physical therapy. On February 17, 2014, Hoffmann authorized plaintiff's use of a TENS unit, three times a day for 30 minutes as

needed for left knee pain, until August 17, 2014.

On February 27, 2014, plaintiff wrote to the health services unit and asked why he was being punished by not being seen by a doctor. He was told that there were a lot of people to be seen and that he would be seen soon. He submitted a similar request on March 2, 2014.

On March 3, 2014, Dr. Hoffmann renewed a preexisting prescription for acetaminophen 500mg, two tablets four times per day, for a total of 4,000mg per day (the maximum dose recommended to avoid the risk of liver damage). Plaintiff refilled this prescription on March 13, April 11, May 2, June 13, July 21 and September 2, 2014 with Hoffmann's approval. He submitted additional health service requests on March 8, 10 and 14, 2014 about needing to see a doctor and wanting more effective pain medication.

On March 19, 2014, Dr. Hoffman examined plaintiff, observed tenderness over the patella and marked crepitus with passive motion in plaintiff's left knee and diagnosed severe symptomatic chondromalacia patellae in the left knee. In Hoffman's opinion, the degenerative changes to the cartilage in plaintiff's knee—likely exacerbated by his history of having played strenuous sports, injuring his leg in a car accident and being morbidly obese—would not resolve on their own and plaintiff was unlikely to be totally pain-free. He prescribed vitamin C 500mg twice a day for one year to help preserve any functionality plaintiff had left in his knee. According to Hoffman, research shows that vitamin C can help synthesize and maintain collagen and cartilage found throughout the body. At that time, Hoffman also knew that plaintiff was scheduled to see an orthopedic surgeon for a

consultation in early April.

On March 31, 2014, plaintiff submitted an interview and information request form in which he stated: "I have been in extreme pain for months and I keep telling the [doctors] and nurses but they are not doing anything about it. The MD went on a 5-minute rant about not giving out pain meds but instead gave me [Vitamin] C can you please call me up to talk to me." Dr. Hoffmann does not specifically recall having a conversation with plaintiff regarding an alleged refusal to prescribe "stronger" pain medication on March 31, 2014, but Hoffmann has often decided not to prescribe opioids to inmates for long-term chronic pain treatment, which is consistent with widely-accepted medical standards. In Hoffmann's medical opinion, plaintiff would always have pain in his left knee and prescribing opioids for a chronic condition that will never get better is inappropriate given the potential for abuse and dependence.

On April 8, 2014, plaintiff saw a provider at the University of Wisconsin orthopedics department, where x-rays were taken, revealing no structural abnormalities, and patellar tendonitis was diagnosed. The examining physician recommended Naproxen or other NSAIDs and ice for relief and stated that there was no need for a follow-up.

On June 14, 2014, Dr. Hoffmann saw plaintiff and noted that none of the orthopedists who had seen plaintiff recommended an operative intervention. He also noted that plaintiff had little success with physical therapy and salsalate, was allergic to ibuprofen and experienced side effects from amitriptyline. Hoffman recommended a physical therapy consultation about other options for a more suitable knee brace, a trial of nortriptyline and

12

a psychiatry consultation about treatment with duloxetine (Cymbalta) rather than fluoxetine, in light of duloxine's indication as both an antidepressant and a pain reliever. Subsequently, he tried several non-opioid options to alleviate plaintiff's knee pain, including gabapentin, duloxetine, nortriptyline, acetaminophen, salsalate, a topical pain formula, topical lidocaine and pregabalin (Lyrica).

On November 27, 2014, plaintiff asked Dr. Hoffmann in a health services request form whether he would talk to Dr. O'Brien about a pain management plan, and Dr. Hoffmann responded that "I will talk to her. No guarantees."


E. 2015 Medical Treatment by Dr. Syed and Specialists

Defendant Dr. Syed was aware of plaintiff's past treatment, medications, orthopedic consultations and physical therapy. On October 6, 2015, he saw plaintiff and offered an injectable pain medication that plaintiff refused because an orthopedist told him those interventions often did more harm than good. Dr. Syed ordered another referral to orthopedics for further evaluation, ordered a referral to physical therapy for a knee brace, reauthorized the existing order for acetaminophen and prescribed Naproxen 500mg twice a day as needed for three weeks.

Dr. Syed does not recall whether he was specifically aware of plaintiff's allergy to ibuprofen or if he verified whether plaintiff was allergic to any NSAID prior to prescribing Naproxen. However, plaintiff's allergy was noted by an assisting provider (either a nurse or pharmacist) and Dr. Syed discontinued the Naproxen on October 8, 2015.

13

Dr. Syed shares Dr. Hoffman's medical opinion that plaintiff's presentation and his additional stressors of weight and history of knee injury make it unlikely that plaintiff will ever be completely pain free. He further agrees with Hoffman that under the relevant standard of care, it is inappropriate to prescribe opioids to manage chronic pain because of the risk of dependence and abuse. Given the nature of plaintiff's condition, his allergy to ibuprofen and the number of previously unsuccessful medications and treatments he has had, Syed does not believe there are any other forms of pain relief he can provide plaintiff.

On October 29, 2015, plaintiff saw specialist Dr. Grossman, who noted that plaintiff had effusion and "pretty marked" patella femoral crepitus with motion. Grossman ordered an imaging study and discussed surgical interventions with plaintiff.

Although plaintiff had an appointment scheduled with Dr. O'Brien on November 11, 2015, she left the institution before seeing plaintiff. On December 29, 2015, plaintiff complained to the health services unit that "he was on the list to see Dr. O'Brien but was not seen in November and then she came back in December and he was not seen again." Health services staff responded that Dr. Syed had reviewed his chart and referred him to Dr. Grossman for follow up care. In January 2016, plaintiff saw Grossman, who stated that plaintiff had to accept the situation or consider arthroscopy and a lateral release.

OPINION

A.  Legal Standard

To prevail on a claim under the Eighth Amendment, a prisoner must show that the defendant was "deliberately indifferent" to a "serious medical need." Estelle v. Gamble, 429 U.S. 97, 104-05 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. Johnson v. Snyder, 444 F.3d 579, 584-85 (7th Cir. 2006). The condition does not have to be life threatening. Id. A medical need may be serious if it "significantly affects an individual's daily activities," Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997), if it causes significant pain, Cooper v. Casey, 97 F.3d 914, 916-17 (7th Cir. 1996), or if it otherwise subjects the prisoner to a substantial risk of serious harm, Farmer v. Brennan, 511 U.S. 825 (1994).

"Deliberate indifference" means that the officials are aware that the prisoner needs medical treatment, but are disregarding the need by failing to take reasonable measures. Forbes v. Edgar, 112 F.3d 262, 266 (7th Cir. 1997). In applying the deliberate indifference standard, "'[a] medical professional is entitled to deference in treatment decisions unless no minimally competent professional would have so responded under those circumstances.'" Roe v. Elyea, 631 F.3d 843, 857 (7th Cir. 2011) (quoting Sain v. Wood, 512 F.3d 886, 894-95 (7th Cir. 2008)). "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible did not actually base the decision on such a judgment." Id. "A delay in treatment may constitute deliberate indifference if the delay

exacerbated the injury or unnecessarily prolonged an inmate's pain." McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010). How long the delay is tolerable "depends on the seriousness of the condition and the ease of providing treatment." Id.

The Court of Appeals for the Seventh Circuit has made it clear that at summary judgment, "[c]onclusory allegations that have no factual support are insufficient to create a genuine issue of material fact." Powers v. Dole, 782 F.2d 689, 695 (7th Cir. 1986). Therefore, to prevail on his claims, plaintiff must present specific evidence showing that defendants did not have adequate medical justification for their treatment decisions. It is not enough for plaintiff to show that he disagrees with defendants' conclusions about the appropriate treatment, Norfleet v. Webster, 439 F.3d 392, 396 (7th Cir. 2006), that other medical providers reached a different conclusion about what treatment to provide plaintiff, Pyles v. Fahim, 771 F.3d 403, 409 (7th Cir. 2014), or even that defendants could have provided better treatment. Lee v. Young, 533 F.3d 505, 511-12 (7th Cir. 2008). Even a showing of negligence or medical malpractice is not enough to prevail on a claim under the Eighth Amendment. Norfleet, 439 F.3d at 396. Rather, plaintiff must show that any medical judgment by defendants was "so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment." Pyles, 771 F.3d at 409. In addition, plaintiff must show how each of the defendants was personally involved in depriving or delaying plaintiff necessary treatment. Kuhn v. Goodlow, 678 F.3d 552, 555-56 (7th Cir. 2012).

Plaintiff generally contends that between 2012 and 2015, defendants did not provide

him effective treatment for his knee pain and delayed his treatment by not allowing him to see a doctor in a timely manner. Defendants do not dispute that they knew that plaintiff suffered from chronic knee pain related to degenerative joint disease, but they argue that plaintiff has failed to present sufficient evidence to show that any of them failed to take reasonable measures or could have done more to address his pain or provide him with treatment. I will address plaintiff's two categories of claims separately.

## B. Denial of Effective Treatment

Plaintiff contends that even though he regularly complained about knee pain, he did not receive effective treatment. Because it is undisputed that defendant Anderson does not provide direct patient care to inmates and cannot evaluate, diagnose, determine a course of treatment for or prescribe medications, plaintiff's claim relates to defendants Dr. Suliene, Dr. Hoffman and Dr. Syed.

Although I understand that plaintiff suffers from chronic knee pain and believes that his physicians should have done more to treat it, he has failed to present any evidence showing that another treatment would have been more effective or that the physician defendants knew about obvious, reasonable alternatives, but refused to consider them. Snipes v. DeTella, 95 F.3d 586, 592 (7th Cir. 1996). The undisputed facts show that Suliene, Hoffman and Syed tried numerous interventions to manage plaintiff's knee pain, including gabapentin, duloxetine, nortriptyline, amitriptyline, acetaminophen, salsalate, a topical pain formula, topical lidocaine, vitamin C and pregabalin. He also underwent

several rounds of physical therapy and was issued a TENS unit, a knee brace and lifting restrictions. All three physicians advised plaintiff to lose weight to alleviate the strain on his knee. In 2015, Dr. Syed offered plaintiff injections to relieve his pain, but plaintiff refused them.

In addition, it is undisputed that the physician defendants regularly referred plaintiff for consultations with outside orthopedic specialists, including Dr. O'Brien, Dr. Grossman and the University of Wisconsin orthopedics department. There is no evidence that any of these specialists recommended stronger pain medication or surgical intervention during the years in which the defendant physicians were treating plaintiff. Surgery was not recommended as an option until January 2016, when Dr. Grossman told plaintiff that he either had to accept his situation or consider operative intervention. In any event, plaintiff has not alleged or presented any evidence showing that defendants prevented him from obtaining surgery.

Apart from vague and general contentions that his treatment was ineffective, plaintiff makes very few specific allegations against Drs. Suliene, Hoffman and Syed. He contends that these defendants gave him "medication" that caused him to have severe stomach pain and cramps. (Although plaintiff suggests in his affidavit and brief that he is referring to acetaminophen and salsalate, he does not make this clear.) In any event, plaintiff fails to present sufficient evidence that any of his physicians knew about his sensitivity to the medication and failed to remedy it. The only evidence that plaintiff presents in support of his contention is a May 6, 2012 health service request in which he complained about

"aspirin" causing him severe stomach cramps. Dkt. #25-2 at 338. Although the parties agree that plaintiff actually was referring to acetaminophen, it is undisputed that plaintiff failed to mention stomach cramps when he saw Dr. Suliene on May 15, 2012 and continued to take acetaminophen and salsalate on several occasions without complaint for three more years. (In his brief, plaintiff refers to a December 29, 2014 health service request in which he complained that salsalate was causing stomach cramps, but he has failed to propose any findings of fact related to this request or present any evidence that his treating physician at the time, Dr. Hoffman, was made aware of the complaint and ignored it.)

Plaintiff also says that Dr. Syed should have known that plaintiff was allergic to Naproxen when he prescribed it for plaintiff on October 6, 2015. However, plaintiff has failed to present any evidence that the prescription was anything more than an oversight on Dr. Syed's part, that he actually was given the medication or that he suffered any harm. The undisputed facts show that Dr. Syed discontinued the prescription on October 8, 2015, as soon as another provider informed him about plaintiff's allergy. Without more, a reasonable jury would conclude that Dr. Syed was at most negligent in prescribing Naproxen, rather than deliberately indifferent to a serious risk of harm to plaintiff.

Finally, plaintiff has failed to present any evidence contradicting the medical opinions of Dr. Hoffman and Dr. Syed that plaintiff's weight and history of knee injuries make it unlikely that he will ever be completely pain free, that it is inappropriate under the relevant standard of care to prescribe opioids to manage plaintiff's chronic pain because of

the risk of dependence and abuse and that plaintiff's allergy to ibuprofen and his lack of

success with numerous other medications and treatments most likely mean that there are

no other forms of pain relief that medical providers can provide plaintiff. In addition, the

Court of Appeals for the Seventh Circuit has made clear that medical staff have considerable

discretion under the Eighth Amendment in choosing appropriate treatment, particularly

with respect to pain medication, which requires medical staff to consider not just a patient's

complaints of pain, but security and addiction concerns as well. Snipes, 95 F.3d at 592

("Using [pain killers] entails risks that doctors must consider in light of the benefits. . . .

Whether and how pain associated with medical treatment should be mitigated is for doctors

to decide free from judicial interference, except in the most extreme situations."). Because

a reasonable jury could not conclude that the conduct of defendants Dr. Suliene, Dr.

Hoffman and Dr. Syed was "blatantly inappropriate" or that any of them knew about

obvious, reasonable alternatives to treat plaintiff's knee pain but refused to consider them,

id., they are entitled to summary judgment with respect to plaintiff's claim that they denied

him effective medical treatment for his knee pain.


## B. Delay in Physician Appointments

Plaintiff generally contends that defendants unreasonably delayed his medical care

by not scheduling timely appointments with prison physicians or outside specialists, even

though he submitted numerous health service requests from 2012 to 2016 about being in

pain and needing to see a doctor for his knee. However, the only evidence that he has

presented in support of this contention relates to defendant Anderson, who reviewed some—but not all—of his requests for help in 2012 and 2013. Although plaintiff also contends that he did not receive timely physician appointments in 2014 and 2015, it is undisputed that Anderson last worked at Columbia on January 12, 2014. Therefore, she could not have had any involvement in the alleged delay in plaintiff's physician appointments after January 12, 2014. Hildebrandt v. Illinois Department of Natural Resources, 347 F.3d 1014, 1036 (7th Cir. 2003) (defendant must have some personal involvement in constitutional deprivation to be liable under § 1983).

Plaintiff generally contends that his doctor appointments "were not made on availability" and that he was not seen by a doctor when scheduled on several occasions. However, as defendants point out, the undisputed evidence shows that health services unit staff responded to plaintiff's requests for care and that plaintiff was seen regularly—albeit not as often as he would have liked—by a physician within or outside the prison. Plaintiff has failed to present any evidence that Anderson or any of the other defendants ignored his requests to see a physician, refused to schedule him for an available appointment or intentionally delayed any appointment. Although plaintiff contends that he often had to wait a couple of months, and in 2013 waited 126 days (or about four months), to see a doctor, he has failed to present any evidence that these delays were attributable to defendants' deliberate indifference rather than scheduling difficulties or the availability of a physician or specialist. Forstner v. Daley, 62 Fed. Appx. 704, 706 (7th Cir. 2003) (delay of 26 months for a knee joint injury caused mainly by transfer of inmate and scheduling of

appointments was not deliberate indifference); <u>Zimmerman v. Prison Health Services, Inc.</u>, 36 Fed. Appx. 202, 203 (7th Cir. 2002) (citing <u>Langston v. Peters</u>, 100 F.3d 1235, 1240 (7th Cir. 1996)) ("[A]lthough excessive delays in medical diagnosis or treatment can establish deliberate indifference, delays due to 'bureaucratic obstacles' and 'scheduling difficulties' are not unconstitutional.").

I understand that plaintiff was frustrated that he was not seen immediately by a physician after he requested to see one. However, absent any evidence other than his own opinion that he required emergency or immediate care, a reasonable jury could not conclude that Anderson acted with deliberate indifference in assessing plaintiff's requests for help. The undisputed facts show that nursing staff reviewed plaintiff's requests quickly, offered him sick call visits with a nurse and scheduled him for appointments with prison physicians or outside specialists as their schedules allowed. Moreover, to show that a delay in treatment was constitutionally unreasonable, plaintiff must demonstrate that the delay had a detrimental impact on his condition. <u>Whitehead v. Mahone</u>, 2011 WL 3241352, at *7 (C.D. Ill. July 29, 2011). Although a reasonable jury could conclude that persistent pain is detrimental, plaintiff has failed to dispute the expert opinions of Drs. Hoffman and Syed that he suffers from a chronic condition from which he may never be pain-free because there are few, if any, treatment options for him. Although surgery later was presented as an option for plaintiff, it was not recommended during the period at issue in this lawsuit. Accordingly, defendants Anderson, Suliene, Hoffman and Syed entitled to summary judgment with respect to plaintiff's claim that they acted with deliberate indifference in

delaying his access to a doctor.

ORDER

IT IS ORDERED that the motion for summary judgment filed by defendants Karen

Anderson, Dr. Dalia Suliene, Dr. Karl Hoffman, Dr. Syed and Kim Campbell, dkt. #22, is

GRANTED.  The clerk of court is directed to enter judgment in favor of defendants and close

this case.

Entered this 20th day of May, 2019.

BY THE COURT:

/s/

_____

BARBARA B. CRABB
District Judge